UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JOSHUA BROOKS #608255     CIVIL ACTION NO. 18-cv-392 SEC P

VERSUS     JUDGE ELIZABETH E. FOOTE

DARREL VANNOY     MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Joshua Brooks ("Petitioner"), at the age of 16, was involved with his 17-year-old brother, Jeremy, and his 16-year-old friend, Paul Jones, in a shooting at the Canaan Village Apartments in Shreveport. An innocent bystander, age 15, was killed. Petitioner, Jeremy, and Paul were arrested and charged with murder.

Petitioner's brother Jeremy was tried first and convicted of second-degree murder. Petitioner and Paul Jones were tried together, and both were also convicted of second-degree murder. The conviction ordinarily carries a mandatory life sentence, but based on Petitioner's juvenile status, he was sentenced to 60 years at hard labor without benefit of parole. His conviction was affirmed on appeal. State v. Brooks, 139 So.3d 1072 (La. App. 2d Cir. 2014), writ denied, 159 So.3d 459 (La. 2015).

Petitioner then filed a post-conviction application in state court, followed by this federal habeas corpus petition. He argues that (1) the evidence was insufficient to support his conviction and (2) his counsel rendered ineffective assistance. For the reasons that follow, it is recommended that his petition be denied.

**Timeliness**

The State raises a timeliness defense to the petition, but additional factual information would be required to rule on that defense with certainty. Rather than attempt to gather that information at this time, the undersigned recommends that the petition be denied on the merits. A brief discussion of the timeliness issue is set forth below.

The Supreme Court of Louisiana denied writs on the post-conviction application on Friday, March 9, 2018. By the State's calculations, the federal petition was due by Monday, March 12, 2018 if it were to be filed within 365 days of un-tolled time.

The mailbox rule applies to the federal petition, meaning that it is considered filed when tendered to prison officials for filing. Spotville v. Cain, 149 F.3d 374 (5th Cir.1998). Petitioner is housed at the Louisiana State Penitentiary, which has an electronic filing arrangement with the court. The federal petition is stamped on the cover as being received by the legal programs department at the prison and emailed to this court on Friday, March 16, 2018, which would make it untimely.

But the federal petition also includes an affidavit/certificate of service in which Petitioner declared that he placed a copy of the petition in the hands of the classification officer assigned to his unit, along with a withdrawal form for the cost of postage and a properly filled out inmate request for indigent/legal mail form. He dated that certificate March 9, 2018, the same day the Supreme Court of Louisiana denied writs. The federal petition would be timely if it were deemed tendered to prison officials and, thus, filed on March 9. It is possible that Petitioner did tender his petition to a prison official on March

9, but delays in processing the postage for the service copy or otherwise prevented it from being e-filed until March 16.

Petitioner earlier filed in the record (Doc. 12, pp. 73-76) copies of Offender's Request for Legal/Indigent Mail forms that he used to submit for mailing his post-conviction application and related writ applications that were filed in state court. Presumably Petitioner completed similar forms when he submitted his federal petition for filing/mailing, but he has not filed that paperwork in the record.

The undersigned is reluctant to attempt to address the timeliness defense without affording the parties the opportunity to submit copies of such mail records, along with any other evidence relevant to the time Petitioner tendered his federal petition to prison officials for filing. It would also be beneficial to deciding the defense for Petitioner to explain how he became aware of the Supreme Court of Louisiana's writ denial on the same day it issued. Perhaps it was served on him electronically, but the record does not indicate. Absent such additional information, the court finds that the better course is to proceed to the merits of the claims. The timeliness defense can be revisited if a reviewing court finds that a claim has merit.

**Sufficiency of the Evidence**

    **A. Relevant Facts**

Petitioner contends in his memorandum that he and his older brother, Jeremy purchased an assault rifle from Ladarious Anderson. Petitioner was at a neighborhood recreational center the next day when Ladarious tried to persuade him to sell the assault rifle back because it did not actually belong to Ladarious, and he needed to return it to the

owner. This led to arguments and disagreements among various young people that led to a confrontation at the Canaan Village Apartments. There is no trial evidence that the alleged gun transaction led to the confrontation, but there is ample testimony that there was some form of disagreement brewing on the day of the shooting.

The evidence showed that Petitioner went inside an apartment and came out with the rifle. He and Jeremy, who also wanted the rifle, struggled or wrestled over it. At some point, the rifle discharged into the ground. Jeremy then took the rifle and began firing it into a group of people gathered at a nearby apartment building that was on a hill or terrace above them. Paul Jones also began shooting at them with a 9 mm handgun. Someone on the hill returned fire with a .25 caliber weapon. After the shooting stopped, Petitioner, Jeremy, and Paul fled the scene, leaving behind a victim at the upper terrace who died of massive blood loss. A forensic pathologist testified that his wounds were caused by a high-velocity rifle.

Sgt. Skyler VanZandt was a crime scene investigator for the Shreveport Police Department. He recovered six fired .25 caliber cases, fired from a semiautomatic pistol, in the upper parking lot where the victim was found. There is no evidence that the victim was armed or fired a weapon. VanZandt found 27 fired 9 mm cartridge cases and 13 fired 7.62x39 mm cartridge cases in the lower area where Petitioner's group was located. The 7.62 rounds are typically associated with semiautomatic rifles (including an AK-47 or SKS). Despite a search, police did not find any weapons on the premises. Tr. 1230-68.

Richard Beighley of the North Louisiana Crime Lab testified as an expert in firearms and tool mark identification. He said that all 27 of the 9 mm casings were fired from the

same weapon, and all of the 7.62x39 mm casings were fired from the same weapon. Of the six .25 caliber casings, five were identified as coming from the same weapon and the sixth had similar class characteristics (meaning it could have come from the same weapon, but there was some interference on the markings). Tr. 1268-81.

Dr. Long Jin, a forensic pathologist who performed the victim's autopsy, testified that the victim died from gunshot wounds to his left wrist and his sacrum. The latter wound severed a major artery, which caused the victim to bleed to death within minutes. The bullets passed through the body, so they were not recovered during the autopsy. Based on exit wounds and other observations, Dr. Jin believed that the wounds were caused by two separate bullets, each fired by a high-velocity rifle. Tr. 1289-1302.

Most of the witnesses to the shooting were teenagers, but almost four years passed between the April 2009 shooting and the January 2013 trial. The evidence discussed above laid a solid foundation that the victim was killed by a bullet fired from Petitioner's group, and particularly from a rifle of the type witnesses placed in the hands of Petitioner and his brother. The testimony of the several witnesses was also relevant to whether Petitioner was a principal to second-degree murder, which is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.

Jamil Johnson, age 15 at trial, was 11 or 12 at the time of the shooting. He lived in the apartments and witnessed arguments among the young men that day. He said that "a lot of cuss words passed back and forth, and some people wanted to fight." He saw Petitioner walk into an apartment building and come out with an assault rifle under his coat. Jamil saw him take the gun to the side of the building and load it by inserting a

magazine, which he had pulled from his back pocket, and working the slide. Petitioner then walked through a breezeway of a building to "where everyone was standing at" and flashed the gun where everyone could see it. Petitioner and his brother then began wrestling over the gun, which fired one time during the tussle. Older brother Jeremy gained control of the rifle, then started shooting it toward the parking lot up the hill. Paul Jones also started firing with a handgun that had an extended magazine. Jamil said that Petitioner said, before he retrieved the rifle, "If we lose someone going to die." Tr. 966-1016.

Jamil's sister, Precious Johnson, was 15 at the time of the shooting. She heard Petitioner and her cousin, Ladarious (aka Peanut), arguing that day. She saw Petitioner with a "chopper," a street name for a semiautomatic rifle, and he fired it once into the ground before Jeremy took it from him and started shooting. She testified that Ladarious told Petitioner "Let's fight," but Ladarious said he was not going to fight if Petitioner was going to pull a gun. Tr. 1016-25.

Sherrell Savore, the victim's twin sister, testified that Ladarious and Petitioner "had words" earlier that day at the rec center, where she had gone to fill out a summer job application. She later got a call that the boys were about to fight, and she saw several people gathered, with Petitioner and an older man named Terrance Holden talking about fighting. Terrance asked Petitioner to come fight in a nearby field, and Petitioner "was like, I ain't taking no losses, I'm shooting." That gathering broke up, but Petitioner "went into the back streets, said he was getting a gun." Later, at the apartments, the arguing continued. Sherrell said that Petitioner "went and got the gun, and he came back out, and the gun like it was too big for him, and it went off, and it shot at the ground." She said it

looked like he was unfamiliar with how to use the gun. It was too big for him, "and he was stumbling and it went off." Then Jeremy took the gun from Petitioner, and Jeremy and Paul started shooting up the hill toward the group she was with. Sherrell testified that Quarshay Robinson fired from the upper area after Petitioner and Jeremy began the shooting. Tr. 1033-73.

Kimberly Savore is the older sister of the victim, and she was 19 or 20 at the time of the shooting. She was visiting her mother's house and was told by her family and their friends that there had been an argument with Petitioner and his group. Her people said that the other group had "pulled a gun on them on a bicycle." The group said they were "fixing to go to the projects and fight them." She did not see any weapons among that group, and she followed them to the projects. She attributed to Petitioner a statement that "they ain't going to take no whooping, but whooping or whatever, and they was talking they was fixing to play pistol play." Petitioner then "went and got the gun, came back, he clocked (sic) it and he shot it," firing it at the ground. She described the weapon as a "chopper" that "is the big gun that shoot a lot of times at one time." Jeremy then wrestled the gun away and started spraying her group with bullets, so they took off running. She estimated that there were "about a hundred" people in the area because children were out of school and outside playing. She said that PJ (Paul Jones) fired multiple shots at her group with a handgun. After fleeing, Kimberly returned to the area and found her brother on the ground in a parking lot. Tr. 1073-1105.

Terrance Holden, age 23 at trial, was in the third years of a seven-year sentence for home invasion when he was called to testify. He was a reluctant witness, to say the least,

and was threatened with additional jail time for contempt if he refused to testify. He said that he and Jeremy Brooks had a gang-related argument on the day of the shooting. They agreed to a fist fight, but Jeremy pulled a "nine millimeter rifle." Holden said he then backed away, but Paul Jones soon walked out of the breezeway with a "chopper, AK-47." He said that "the other man," presumably Petitioner, tried to stop it and shot at the ground. Then Jeremy and Paul started shooting at Holden. He said that Paul was shooting the AK and Jeremy was shooting a nine millimeter. On cross-examination, defense counsel pointed to Petitioner and asked if Holden saw him with a weapon, and Holden said no. Tr. 1112-37.

Javvaria Cockeram was 20 at the time of trial. He said that there was "supposed to have been a fight, but it ain't go down how it supposed to have went down, so Josh went in the house and got the chopper and he came back out with the chopper, . . . and he shot it, but it was like in the ground, and then him and Jeremy took it from him, and Jeremy got to shooting, then Quarshay returned fire, then Paul got to shooting."

The fight was supposed to have been between Jeremy and Terrance Holden, and Javvaria was with the Holden group. At another point, Javvaria said that the fight was supposed to be between Petitioner and Peanut because they got into it at the rec center. Jeremy had been walking around and "mugging" at them, to indicate that he had something against them. Words were also exchanged. When the men were supposed to fight, Jeremy backed up, pulled a handgun out of his pocket, and gave it to Paul Jones. Petitioner then ran in the house and returned with the chopper and said, "Ain't nobody fixing to fight my brother, whoo, whoo, whoo, whoo, whoo." Javvaria said that his use of "whoo" meant that

there was just a lot of mouthing off. He claimed that Petitioner fired the rifle into the ground two times before Jeremy wrestled it away from him. Javvaria also said that Petitioner "said if Peanut (Ladarious Anderson) beat him up he's going to shoot him, so either way it go he's going to win." Tr. 1137-57.

Ladarious Anderson was 18 at the time of the shooting. He had known the victim all his life, and they were like family. He went to the rec center to fill out job applications and shoot pool. Petitioner and some other males came in and wanted to play pool against them, but Anderson's group did not want to play them and left. He then "bumped heads" with Petitioner outside, and Petitioner began mugging him and asked him if he wanted to fight. Anderson and his group left, but the group "bumped heads" with Jeremy later that day. Jeremy cursed them, and Anderson responded that he was talking like that only because police were nearby, but they could go behind a nearby school and fight. They later ended up near the apartments, and Petitioner and a lot of other people were also in the area.

Anderson said that a girl suggested Peanut and Petitioner fight and get it over. He testified that Petitioner "was like, if I fight and I lose, I'm still going to shoot, like that there." Later, he saw Petitioner walk out of a breezeway at the apartments with an assault rifle "holding it like he was fixing to try to shoot it at something." Petitioner and Jeremy started fighting over the gun, and it fired. Jeremy then snatched the gun and started shooting. Paul Jones started firing a black 9 mm handgun. Anderson was standing right in front of them when they started firing, and he took off running. The shooters were firing in front of them toward people, not into the air. Tr. 1157-97.

Sedricka Ragster was 19 at the time of trial. The victim was her younger cousin. She was also at the rec center that morning, and she saw Petitioner and her brother, Javvaria, exchange words. It looked like Petitioner and Peanut were about to fight. There was no fight, and her group returned to the projects. She later got a call that there was about to be a fight, and she went to the area where the boys were arguing. She said that she saw Petitioner pass a handgun to Paul Jones. The two groups broke up without any fighting.

Later, back at the projects, she saw the two groups engage with each other again. Peanut and Petitioner were exchanging words, and Petitioner "was like, I ain't taking no loss, I ain't taking no loss." She said, "That mean you ain't fixing to get beat up, you ain't fixing to fight, so they rather play pistol play." Petitioner later retrieved a chopper/rifle. He and Jeremy fought over it, and then Petitioner shot into the ground "like two times" before Jeremy took it and began shooting up the hill at the group of people in that area. Paul Jones started shooting the handgun. Several small children were playing outside, and they all ran, along with the target group of young people. She saw the victim's body soon after the shooting.

On cross-examination, Sedricka said that she also heard shots coming from the upper parking lot but did not see who was firing. She perceived that they were shooting down at the area where she was, near Petitioner and his group. She repeated that when Petitioner said he was not taking any losses, which he "just kept saying," that was well understood in the local slang to mean that "you ain't fixing to fight you going to shoot." She was asked again about Petitioner arriving on the scene with the rifle and testified:

> It's bigger than him. You know, he was a little short little nigga back in the day. He was toting that thing about to fall. He couldn't handle it. That's why his brother had to step in his place.

She said that Jeremy took the rifle after Petitioner twice fired it into the ground because he could not hold it properly. She was asked if Petitioner was trying to stop the fight, and she said, "He was instigating, he was not trying to stop it." 1198-1221.

### B. State Court Decision

The jury found both Petitioner and Jones guilty of second degree murder by votes of 10-2. Tr. 1361-63. Petitioner argued on direct appeal, as he does here, that the evidence was insufficient. In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court conducted a thorough review of the evidence and applied the Jackson standard. It set forth the elements of second-degree murder—killing when the offender has a specific intent to kill or inflict great bodily harm—and described Louisiana law regarding being a principal to that crime. Under La. R.S. 14:24, all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. Louisiana jurisprudence does not allow mere presence

at the scene to make a person a principal to a crime, but acting in concert with others makes each person responsible not only for his own acts but the acts of the other. Thus, the law of principals allows a person to be convicted of an offense even if he did not personally fire the fatal shot. State v. Brooks, 139 So.3d at 1076.

The appellate court determined that the jury was "well within its discretion" to dismiss any minor inconsistencies in the testimony and credit the testimony that showed that Petitioner "escalated a verbal altercation into a deadly confrontation by arming himself with an assault rifle, loading it, and then fighting to keep the weapon when his brother attempted to take it." The court noted that Petitioner had repeatedly said that he was not going to take a loss in a fight and would resort to pistol play. Thus, his actions were well beyond mere presence at the scene, and the record contained more than sufficient evidence for a reasonable juror to conclude that he had the requisite intent to support a conviction for second-degree murder of the victim. The evidence also showed that Petitioner acted in concert with the other two participants to bring about the shooting that caused the death of the victim. State v. Brooks, 139 So.3d at 1078-79.

**C. Habeas Review**

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a

sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Petitioner argues that the testimony of the various witnesses was full of contradictions, but "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). And "under Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995).

Petitioner also argues that he did not shoot at anyone and that he was not a principal to what happened. He claims that he was retrieving the rifle to return it to the person who wrongfully sold it to him, and shooting simultaneously began, causing Jeremy to take the gun and return cover fire. That story, however, is not supported by the evidence that was presented at trial. Petitioner did not testify, and he did not offer any defense witnesses in support of this claimed version of events. The testimony described above gave no indication that Petitioner was merely returning a rifle when shots happened to be fired in his direction. To the contrary, almost all of the witnesses suggested that Petitioner was engaged in a fight/argument and produced the rifle to use it against his opponents. Witnesses testified that Petitioner had said multiple times that he would use a gun before losing a fight.

The state court thoroughly reviewed the evidence and assessed it in light of the elements of the crime and the Jackson standard. It determined in a well-reasoned opinion

that the verdict withstood review under Jackson. This court reviews the habeas attack on the verdict through a doubly deferential standard. After considering the relevant facts and law, it cannot be said that the state court decision was an objectively unreasonable application of Jackson to the facts and verdict, so habeas relief is not permitted on this claim.

**Ineffective Assistance of Counsel**

### A. The Alleged Witnesses

Petitioner argues that his trial attorney, Frank Zaccaria, rendered ineffective assistance of counsel because he did not interview and subpoena to trial three eyewitnesses: Alexis, Dallas, and Sable Jones. Petitioner claims that he explained to counsel his version of the events, in which he was merely returning the rifle to the person who sold it to him, and he gave counsel the names of Alexis, Dallas, and Sable as eyewitnesses who were willing to testify. He claims that they would have said that they never heard Petitioner say he was going to shoot anyone before or after the shooting began. Petitioner claims that counsel never spoke to these potential witnesses, even though Petitioner gave him phone numbers and the witnesses were present in the courtroom when the trial began. He claims that counsel told him that the witnesses could not testify because he had been too busy to get around to interviewing any witnesses, the case was not his only priority, and he failed to submit their names in discovery.

### B. State Court Decision

Petitioner presented this argument to the state court in his post-conviction application. Tr. 1552-56. He attached to the application his affidavit in which he set forth

his version of the facts that led to the shooting. He testified in the affidavit that he told counsel that he encountered the three subject witnesses after the events, and they said they were willing to testify and knew for a fact that Petitioner did not say anything about shooting. He added that he gave counsel the address and phone numbers of the witnesses and asked that he talk to them. Tr. 1562-63.

Judge Brady O'Callaghan issued a written decision that acknowledged the claim, reviewed the Strickland standard, and summarily concluded that Petitioner did not meet his burden. Tr. 1584-85. The appellate court denied a writ application in a short opinion that acknowledged that Petitioner had raised a Strickland claim but, "On the showing made, the writ is denied." Tr. 1640. The Supreme Court of Louisiana denied a writ application in a per curiam that stated Petitioner failed to show he received ineffective assistance of counsel under the standard of Strickland. Chief Justice Johnson wrote that she would grant a writ to review the 60-year sentence without parole. Justice Hughes wrote that he would grant an evidentiary hearing. Tr. 1709-12.

**C. Habeas Review**

To prevail on a claim of ineffective assistance of counsel, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness. He must also show that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

The state court denied the Strickland claim on the merits, in summary fashion. But "Section 2254(d) applies even where there has been a summary denial." Cullen v.

Pinholster, 131 S.Ct. 1388, 1402 (2011). A petitioner who challenges a state court's summary denial may meet his burden under the first prong of Section 2254(d) only by showing that there was "no reasonable basis" for the state court's decision. The federal habeas court must determine what arguments or theories could have supported the summary decision, and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. Pinholster, 131 S.Ct. at 1402, citing Harrington v. Richter, 131 S.Ct. 770, 786 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, quoting Yarborough v. Alvarado, 124 S.Ct. 2140 (2004).

      The claim faces yet another burden in that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000). And for Petitioner to demonstrate Strickland prejudice, "[he] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial." Id. Evans reversed a district court that had granted habeas relief on a similar Strickland claim when it assumed that witnesses, from whom no affidavits were presented, would have testified favorably for the defense. See also Bruce v. Cockrell, 74 Fed. Appx. 326 (5th Cir. 2003)(rejecting Strickland claim because petitioner "did not submit any affidavits by the uncalled witnesses themselves, or offer any evidence that they would have been willing to testify at the punishment phase of his trial."); and O'Brien v.

Dretke, 156 Fed. Appx. 724 (5th Cir. 2005) (denying COA when witness's affidavit was submitted but it "d[id] not indicate what the nature of his testimony would have been.")

Petitioner submitted his own affidavit to the state court that described the witnesses and their potential testimony (they did not hear him say that he intended to shoot anyone), but he offered nothing from the witnesses themselves. Petitioner complains that he is incarcerated, making it difficult to gather such evidence, and the state court did not conduct a hearing to develop the evidence. But "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." Boyer v. Vannoy, 863 F.3d 428, 446 (5th Cir. 2017), quoting Valdez v. Cockrell, 274 F.3d 941, 951 (5th Cir. 2001). Considering the applicable law and the lack of affidavits from the witnesses themselves, this court cannot say that the state court's denial of this claim was an objectively unreasonable application of Strickland.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of January, 2021.

Mark L. Hornsby
U.S. Magistrate Judge